**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CHARLES CHISLER,                              )
                                              )          **Civil Action No. 09-1282**
      Plaintiff,                          )          **Judge Nora Barry Fischer**
v.                                            )
                                              )
SERGEANT EDWARD P. JOHNSTON,                  )
LIEUTENANT TIMOTHY M. WENTROBLE,              )
LIEUTENANT SUTTON, LIEUTENANT                 )
DONALD HOCKENBERRY, SERGEANT                  )
DANIEL J. LYNCH, JR., SERGEANT JOSEPH         )
PALANCHAR, SERGEANT CLAYTON                   )
STONER, CORRECTIONS OFFICER ERIK              )
KELLER, and JOHN OR JANE DOE(S),              )
                                              )
      Defendants.                         )

**MEMORANDUM OPINION**

I.      **Introduction**

Plaintiff Charles Chisler ("Plaintiff") filed the instant civil action pursuant to 42 U.S.C. §
1983 against Sergeant ("Sgt.") Edward P. Johnston ("Johnston"), Lieutenant ("Lt.") Timothy M.
Wentroble ("Wentroble"), Sgt. Clayton Stoner ("Stoner"), Corrections Officer ("CO") Erik
Keller ("Keller")(collectively "Training Defendants"), Lt. Sutton ("Sutton"), Lt. Donald
Hockenberry ("Hockenberry"), Sgt. Daniel J. Lynch, Jr. ("Lynch"), Sgt. Joseph Palanchar
("Palanchar"), (collectively "Supervisory Defendants"), and John or Jane Doe(s).  Plaintiff
alleges that Defendants violated his constitutional rights under the Fourth and Fourteenth
Amendments of the United States Constitution during a training exercise on October 7, 2007, in
which the Training Defendants hog-tied Plaintiff.  Presently before the Court are Motions to
Dismiss filed by the Training Defendants (Docket Nos. [28], [39], [42]) and the Supervisory

Defendants (Docket No. [35]).[1]  Upon consideration of the parties' submissions, and for the following reasons, Defendants' Motions to Dismiss are DENIED.

## II.    Factual Background

Since this matter comes before the Court on motions to dismiss, the allegations contained in the First Amended Complaint are assumed to be true.  *Hemi Group, LLC v. City of New York*, -- U.S. --, 130 S.Ct. 983, 986-87 (2010)(citing *Leatherman v. Tarrant County Narcotics and Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993)).

### A.    The Incident of October 7, 2007

On July 9, 2007, Plaintiff began his employment as a Corrections Officer ("CO") at the State Correctional Institute Fayette ("SCI-Fayette").[2]  (Docket No. 21 at ¶ 18).  Prior to working on site at SCI-Fayette, Plaintiff received a two-week orientation and five weeks of training.  (*Id.* at ¶ 19). During his first year of employment, Plaintiff was to receive regular training from sergeants and lieutenants assigned to training duties.  (*Id.* at ¶ 2).  All CO's are Correction Officer Trainees ("COT's") during this training period.  (*Id.* at ¶ 19).  COT's are provided with a "training book" which contains the objectives that the COT must review and accomplish during his or her training.  (*Id.* at ¶ 20).  The Training Sergeant for the day checks the COT's book to

---

[1]

The Training Defendants' Motions all incorporate by reference the relevant arguments in the Supervisory Defendants' Motion.  (Docket No. 29 at 1-2; Docket No. 40 at 2-3; Docket No. 43 at 2-3).

[2]

SCI-Fayette is a state correctional facility located in Fayette County, Pennsylvania and is operated and managed as a subdivision of the Department of Corrections of the Commonwealth of Pennsylvania.   (Docket   No.   21   at   ¶   18). http://www.portal.state.pa.us/portal/server.pt/community/hide-fayette/11329 (last visited March 23, 2010).

find objectives that have not been previously accomplished, reviews an objective with the COT, then signs off on that particular objective for the day with the COT. (*Id.*).

At SCI-Fayette, between two wings of prisoner cells, there is a room referred to as the "bubble," which contains the controls for the two adjacent wings. (Docket No. 21 at ¶ 23). On October 7, 2007, Plaintiff was assigned to D Block, A Pod, and Johnston was assigned as Plaintiff's Training Sergeant for that day. (*Id.* at ¶ 22-23). Johnston ordered Plaintiff into the bubble for his day's training. (*Id.* at ¶ 23). Plaintiff entered the bubble with Johnston, Wentroble, Stoner, and CO Mackzo to receive his training. (*Id.* at ¶ 24). Keller was already in the bubble when Plaintiff entered as he was on-duty. (*Id.*).

Once inside the bubble, Johnston ordered Plaintiff to remove his equipment, including his keys, radio, and Personal Arm Transmitter ("PAT"). (Docket No. 21 at ¶ 26). Plaintiff initially refused to remove his keys because it violated CO rules to do so and he believed this order was an attempt to discern whether he would follow that rule. (*Id.*). Johnston repeated the order, and Plaintiff again refused. (*Id.*). Using the authority of his position as Training Sergeant, Johnston told Plaintiff it was permissible to remove his equipment as it was for training purposes. (*Id.*). Only then did Plaintiff comply with the order. (*Id.*).

The Training Defendants ordered Plaintiff to handcuff himself, and he refused. (Docket No. 21 at ¶ 27). Keller called CO Rogers and asked him to tell Plaintiff whether he should cuff himself. (*Id.*). CO Rogers told Plaintiff that he should handcuff himself or he would be "choked out" as he had been during his training. (*Id.*). After he again refused to handcuff himself, the Training Defendants approached Plaintiff, at which time Plaintiff told them to stop. (*Id.* at ¶ 28). Keller handcuffed Plaintiff's left wrist and told him to handcuff the right one himself, which Plaintiff refused to do. (*Id.*). Stoner and Johnston grabbed Plaintiff's right arm and handcuffed

3

his hands behind his back.  (*Id.*).  One or all of the Training Defendants hit Plaintiff on his right side and ordered him to the ground several times.  (*Id.*).

Johnston, Wentroble, Stoner, and Keller also verbally abused Plaintiff.  (Docket No. 21 at ¶ 28).  After refusing to go to the ground, Stoner kicked Plaintiff and forced him to the ground. (*Id.* at ¶ 29).  Plaintiff's legs were pulled out from under him and his feet were forced up to his hands behind his back.  (*Id.*).  The Training Defendants used an electrical extension cord to tie Plaintiff's hands to his feet behind his back, or to "hog-tie" him.  (*Id.*).  Plaintiff stopped resisting when it became difficult to breathe.  (*Id.*). He felt as if he were suffocating.  (*Id.*).  Because hog-tying an individual can result in asphyxiation which may cause death, the Training Defendants applied deadly force to Plaintiff.  (*Id.* at ¶ 30).  Plaintiff was physically immobilized in this position and held down by Johnston, Wentroble and Stoner.  (*Id.* at ¶ 31).  Wentroble uncuffed Plaintiff's left wrist only, leaving Plaintiff to remove the other handcuff and leg restraints.  (*Id.*). As the Training Defendants were leaving the bubble, Plaintiff claims they said to him "Chisler! This never happened today!"  (*Id.*).

### B.    Plaintiff's Attempts to Report the Incident

Immediately following the incident, Plaintiff told Sgt. Braunlich[3] what had happened. (*Id.* at ¶ 32).  According to Plaintiff, Sgt. Braunlich considered the incident "business as usual." (*Id.*).  The Training Defendants told other CO's as well as inmates at SCI-Fayette what they had done to Plaintiff, which Plaintiff claims caused him to suffer embarrassment, humiliation and other mental trauma.  (*Id.* at ¶ 33).  On October 8, 2007 Plaintiff returned to work and informed

---

[3]

Sgt. Braunlich has not been named as a Defendant.  Also, Plaintiff did not mention Sgt. Braunlich's first name in the First Amended Complaint.

4

Defendant Lynch about the incident, yet Lynch did not initiate an investigation.  (*Id.* at ¶ 34).
Also, CO Terry Childs asked Plaintiff if he had heard that in the past he, Childs, had been
handcuffed and punched in the chest by CO Sheetz and Wentroble.  (*Id.* at ¶ 35).

After being off from work on October 9 and 10, on October 11, 2007 Plaintiff again told
Lynch about the incident, and Lynch allegedly informed Plaintiff that this conduct did not
violate any SCI-Fayette policy and, therefore, there would be no investigation. (*Id.* at ¶ 36).  On
October 13, 2007 Plaintiff made yet another attempt to report the incident, but this time to both
Palanchar and Lynch.  (*Id.* at ¶ 37).  This time, Palanchar and Lynch asked Plaintiff if he wanted
to see "the boss" now or the following Monday.  (*Id.*).  Plaintiff said he wanted to go
immediately and was taken to the muster room to speak to the "boss[es]," Sutton and
Hockenberry.  (*Id.*).

Plaintiff relayed the incident of October 7, 2007 to Lynch, Sutton and Hockenberry, who,
in response, actively discouraged Plaintiff from reporting the incident.  (*Id.* at ¶ 38).  According
to Plaintiff, Sutton knew Wentroble had prior disciplinary problems and wanted to "protect" him.
(*Id.*).  Additionally, Plaintiff claims that Sutton warned him that if he pursued the matter further,
"he just f**ked his career," and that Sutton told him that he had worked at SCI-Fayette for
twenty-three years and he was not throwing it away over this  (*Id.* at ¶¶ 39-40).  Hockenberry
then asked Plaintiff if he had an attorney, at which time Plaintiff requested Union representation.
(*Id.* at ¶ 40).  Sutton and Hockenberry refused Plaintiff's request and told him that he might get
"street" time over this.  (*Id.*).

Sutton and Hockenberry left the muster room and Palanchar and Lynch reentered the
room.  Stoner, also in the room, suggested a cover story to explain Plaintiff's injuries while still
permitting him to receive workers compensation benefits.  (*Id.* at ¶ 42).  He suggested that

5

Plaintiff claim he received his injuries during a "trouble call" to dissipate an inmate dispute. (*Id.*).   During the meeting, Wentroble phoned the muster room to tell Plaintiff to refrain from reporting the incident because he could not afford to get in any more trouble.  (*Id.* at ¶ 44). Instead, Wentroble told Plaintiff to lie about his injuries, and he would ensure that Plaintiff received disability leave.  (*Id.*).  Lynch also told Plaintiff to omit from the incident report that he had been hog-tied.  (*Id.* at ¶ 45).  Lieutenant Jones then entered the room, told Palanchar and Lynch to leave, and asked Plaintiff to omit Palanchar and Lynch from the incident report because he wanted to limit the scope of the investigation by not involving them.  (*Id.* at ¶ 46).

Plaintiff filed for and received Workers' Compensation benefits.  (*Id.* at ¶ 50).  As of the date of the filing of this Complaint, Plaintiff has been unable to return to his position at SCI-Fayette and is still receiving Workers' Compensation benefits.  (*Id.*).

The Department of Corrections ("DOC") investigated the October 7, 2007 incident and instituted disciplinary proceedings against Johnston, Wentroble, Stoner, Keller and CO Mackzo. (*Id.* at ¶ 51).  The DOC subpoenaed Plaintiff to testify at these proceedings.  (*Id.*).  Plaintiff complied with the subpoena and testified, at what he claims was "great psychological and emotional cost."  (*Id.*).  No "John or Jane Doe(s)" instituted disciplinary proceedings against Sutton, Hockenberry, Palanchar or Lynch for their refusal to conduct an investigation.  (*Id.*).

In Count I of the First Amended Complaint, Plaintiff alleges that the Training Defendants violated his Fourth Amendment rights with use of excessive force and violated his Fourteenth Amendment substantive due process rights.  (Docket No. 21 at ¶ 58).  Plaintiff claims in Count II that Hockenberry and Sutton violated his Fourteenth Amendment substantive due process rights by failing to take any action to stop the practice of hazing and violence at SCI-Fayette and to discipline the Training Defendants for their conduct.  (*Id.* at ¶¶ 63-64).  In Count III, Plaintiff

6

claims that Hockenberry, Lynch, and Palanchar violated his Fourteenth Amendment right to substantive due process by attempting to cover up the incident and threatening Plaintiff with the loss of his career.  (*Id.* at ¶¶ 73-74).  In Count IV, Plaintiff claims certain "John or Jane Doe(s)"[4] also violated his rights under the Fourth and Fourteenth Amendments.  (*Id.* at ¶ 81).  Plaintiff seeks a declaratory judgment finding that Defendants violated his civil rights, a preliminary or permanent injunction against Defendants enjoining them from any further attacks against Plaintiff or additional violations of his constitutional rights, and compensatory and punitive damages.  (*Id.* at 20).

## III.   Procedural History

Plaintiff initiated this action on September 21, 2009 by filing his Complaint.  (Docket No. 1).  Defendants Sutton, Hockenberry, Lynch, and Palanchar filed an initial motion to dismiss Plaintiff's Complaint on November 24, 2009.  (Docket No. 16).  In response, on December 10, 2009, Plaintiff filed his First Amended Complaint.  (Docket No. 21).  Between December 21, 2009 and January 13, 2010, each Defendant joined one of four Motions to Dismiss Plaintiff's First Amended Complaint under Rule 12(b)(6).  (Docket Nos. 28, 35, 39, and 42).  Defendants Sutton, Hockenberry, Lynch and Palanchar, all represented by the Pennsylvania Attorney General, filed a brief in support of their Motion to Dismiss (Docket No. 36), which all other Defendants incorporate by reference in their respective briefs.  (*See* Docket Nos. 29, 40, and 43).  Plaintiff filed an individual Response and Brief in Opposition to each Motion to Dismiss on

---

[4]    The "John or Jane Doe(s)" are additional supervisors or officers at SCI-Fayette that would have the authority to discipline the Supervisory Defendants.  (*See* Docket No. 21 at ¶ 80).

February 5, 2010.  (Docket Nos. 50-57).  As the motions are fully briefed, they are ripe for disposition.

## IV.    Standard of Review

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)(citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2008)); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009); and FED. R. CIV. P. 8(a)(2)(a valid complaint requires only "a short and plain statement of the claim" showing entitlement to relief."). The Supreme Court in *Iqbal* clarified that the decision in *Twombly* "expounded the pleading standard for 'all civil actions.'" *Iqbal*, 129 S.Ct. at 1953; *Fowler*, 578 F.3d at 210-11. The Court further explained that although a court must accept as true all of the factual allegations contained in a complaint, that requirement does not apply to legal conclusions; therefore, the pleadings must include factual allegations to support the legal claims asserted. *Iqbal*, 129 S.Ct. at 1949, 1953. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 555); *see also Fowler*, 578 F.3d at 210; and *Phillips v. County of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008). The determination of whether a complainant has sufficiently pled a claim "is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S.Ct. at 1950 (citing *Twombly*, 550 U.S. at 556); *see also Fowler*, 578 F.3d at 210-11 (holding that in light of *Iqbal*, a district court should first separate the factual and legal elements of a claim and then, accepting the "well-pleaded facts as true," "determine whether the facts" pled are sufficient to show a "'plausible claim for relief.'"). Ultimately, to

survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct.

at 1949 (citing *Twombly*, 550 U.S. at 556).

## V.    Discussion

As noted, Plaintiff has brought suit for damages under 42 U.S.C. § 1983 and under the

Fourth and Fourteenth Amendments.  (Docket No. 21 at ¶¶ 56-83).[5]  Section 5 of the Fourteenth

Amendment gives Congress the power to enforce, "by appropriate legislation," the substantive

provision contained in § 1. U.S. CONST. amend. XIV, § 5.  Pursuant to this authority, as well as

other constitutional sources of legislative jurisdiction, Congress has enacted Section 1983, which

provides:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress, except that in any action brought against a
> judicial officer for an act or omission taken in such officer's
> judicial capacity, injunctive relief shall not be granted unless a
> declaratory decree was violated or declaratory relief was
> unavailable.

42 U.S.C. § 1983.  To state a claim under § 1983, a plaintiff must show "(1) that the conduct

complained of was committed by a person acting under color of state law; and (2) that the

conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws

---

[5]

Defendants have not challenged the sufficiency of Plaintiff's Fourth Amendment claims,
aside from the state action requirement, which will be addressed herein.  (Docket Nos. 28, 35,
39, and 42).

of the United States." *Robb v. City of Philadelphia*, 733 F.3d 286, 290-91 (3d Cir. 1984)(citing *Paratt v. Taylor*, 451 U.S. 527, 535 (1981)). For § 1983 purposes, actions taken "under color of law" are equivalent to "state action" under the Fourteenth Amendment. *Leshko v. Servis,* 423 F.3d 337, 339 (3d Cir. 2005). The "color of state law requirement is a threshold issue; there is no liability under §1983 for those not acting under color of law." *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982); *Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995). Defendants have challenged whether the Training Defendants acted under color of law as an initial issue, and the Court will now consider same.

### A. The Training Defendants Acted Under Color of State Law[6]

The Training Defendants argue that they were not acting under color of state law because the hazing incident amounted to actions that were purely private and not within the scope of their employment. (Docket No. 36 at 7-10). Plaintiff counters that because the Training Defendants had no "personal" relationship with Plaintiff and acted with the authority conferred upon them as training officers, they acted under color of state law. (Docket Nos. 51, 55, and 57 at 6-10).

An individual acts under color of state law if he acts with or pursuant to power possessed by virtue of state law and made possible only because the wrongdoer is "clothed" with the authority of state law. *Barna v. City of Perth Amboy*, 42 F.3d 809, 815-16 (3d Cir. 1994). "State officials may be state actors for the purposes of § 1983 liability." *Showalter v. Brubaker*, 283 Fed.Appx. 33, 35 (3d Cir. 2008)(citing *Angelico v. Lehigh Valley Hosp., Inc.,* 184 F.3d 268, 277 (3d Cir. 1999)). "If an individual is possessed of state authority, and purports to act under that

---

[6]

The Court notes at the outset that none of the Defendants have raised the defense of qualified immunity. (*See* Docket Nos. 28, 35, 39, and 42).

authority, his action is state action.  It is irrelevant that he might have taken the same action had

he acted in a purely private capacity."  *Barna*, 42 F.3d at 816.  However, while "acts of a state or

local employee in her official capacity will generally have been found to have occurred under

color of state law" *Barna*, 42 F.3d at 816, not all torts committed by state employees constitute

state action.  *See Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 24 (3d Cir. 1997).  Excluded from

the reach of the under-color-of-law element are the "*purely private* acts not furthered by any

actual or purported state authority."  *Showalter*, 283 Fed.Appx. at 35 (citing *Bronenberger*, 132

F.3d at 24)(emphasis added).  Overall, the "essence of § 1983's color of law requirement is that

the alleged offender, in committing the act complained of, abused a power or position granted by

the state."  *Bronenberger*, 132 F.3d at 24; *see also United States v. Screws*, 325 U.S. 91, 111

(1945)("Acts of officers who undertake to perform their official duties are included whether they

hew the line of authority or overstep it.").

A distinguishing factor, therefore, in the color of law analysis is whether the violation

"occurred as a result of official police concerns" or it "arose out of the officer's familial and

personal concerns."  *Barna*, 42 F.3d at 818.  In *Barna*, the United States Court of Appeals for the

Third Circuit analyzed the conduct of off-duty police officers who brandished their state-issued

nightsticks during a purely personal dispute outside of their jurisdiction.  *Id.* at 816.  The Court

of Appeals concluded that because the evidence indicated that the dispute arose out of the

officers' familial and personal concerns, use of the state-issued nightstick did not amount to an

assertion of official authority.  *Id.* at 817-19.  In contrast, in *Black v. Stephens*, 662 F.2d 181 (3d

Cir. 1981), the Court of Appeals found sufficient indicia of state authority to conclude that on-

duty police officers were acting under color of law.  There, the Court of Appeals found that the

offending officer acted under color of state law because he was wearing a police academy

11

NBF

windbreaker, was on-duty, and initiated contact with the plaintiff because he believed the plaintiff's activity warranted investigation. *Id* at 188.

Turning to the instant case and presuming that the facts alleged in the First Amended Complaint are true, the Court finds that Plaintiff has sufficiently alleged that the Training Defendants acted under color of state law.   Using his authority as training officer, Johnston ordered Plaintiff into the "bubble" and asked him to remove his equipment, including his PAT and keys. (Docket No. 21 at ¶ 26).  Plaintiff initially refused because he knew it was against the rules and only complied with the order when Johnston informed him that it was permissible to remove his equipment for training purposes.  (*Id.*).  The Training Defendants also ordered Plaintiff to handcuff himself or they would "choke him out."  (*Id.* at ¶ 27).  When Plaintiff refused, the Training Defendants handcuffed his hands behind his back, hit him on his right side, shoved him to the ground and used an electrical extension cord to hog-tie him.  (*Id.* at ¶¶ 28-29).  Plaintiff claims that this kind of conduct is an apparent custom between CO's and COT's.  (*Id.* at ¶ 21).   In sum, the Training Defendants, while on state property, on-duty and in uniform, exercised their authority as training officers to force Plaintiff into the "bubble" so they could hog-tie him.  (*Id.* at ¶¶ 26-29).   They did so during their shifts as training officers and during a purported training exercise, following a training tradition.  (*Id.* at ¶¶ 21, 26).[7]  These allegations

---

[7]

Furthermore, Plaintiff has pled that he applied for and received workers' compensation benefits from the Department of Corrections.   (Docket No. 21 at ¶ 50).  The Pennsylvania Workmen's Compensation Act specifically excludes from compensation any injuries that are "caused by an act of a third person intended to injure the employee because of reasons personal to him and not directed against him as an employee or because of his employment."  77 P.S. §411(1).  *See Kryeski v. Schott Glass Technologies, Inc.*, 9 Pa.D&C4th 399, 403-04, 1991 WL 319990 (1991); *Mike v. Borough of Aliquippa*, 279 Pa. Super. 382, 421 A.2d 251 (1980).  As Plaintiff received workers' compensation benefits, a determination may have been made or Plaintiff's employer acquiesced that the incident was part of Plaintiff's employment and not a personal frolic on the part

are significant indicia of state authority.  Moreover, the Training Defendants were not motivated purely by personal or familial concerns.  (*See id.* at ¶ 25).

Accordingly, the Court finds that, under *Iqbal* and *Twombly*, Plaintiff sufficiently pled that the Training Defendants abused a power and position granted to them by the state to commit the acts complained of, and, therefore, acted under color of state law.  The Court now turns to whether Plaintiff has sufficiently alleged a violation of his constitutional rights.

### B.      Plaintiff Sufficiently Alleged a Violation of his Fourteenth Amendment Rights

Defendants contend that the conduct of the Training Defendants merely amounts to a state law tort, which does not rise to the level of a § 1983 constitutional violation.  (Docket No. 36 at 5-7).  Plaintiff counters that the conduct may fairly be said to shock the contemporary conscience and, therefore, amounts to a violation of Plaintiff's substantive due process rights under the Fourteenth Amendment.  (Docket Nos. 51, 55 and 57 at 12-18).  For the following reasons, the Court finds that Plaintiff has adequately pled a claim for a violation of his Fourteenth Amendment rights.

The Due Process Clause includes protections for both procedural and substantive due process.  *Rock v. Gonzales*, 545 U.S. 748, 755 (2005).  "To establish a substantive due process claim under § 1983, the plaintiff must prove (1) the particular interest at issue is protected by the Fourteenth Amendment, and (2) the government's deprivation of that protected interest shocks the conscience."  *Connection Training Serv's. v. City of Philadelphia*, No. 09-1856, 2009 U.S. App. LEXIS 28072, at *12 (3d Cir. 2009)(citing *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008)).

---

of the Training Defendants.

13

Defendants primarily argue that Plaintiff merely sets forth a claim of hazing, a tort defined by Pennsylvania law that generally applies to college students,[8] and that the claim does not rise to the level of a constitutional violation.  (Docket No. 36 at 5).  However, state law torts and constitutional violations are not mutually exclusive, and the conduct must be analyzed within the context of the precise circumstances surrounding it.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 845, (1998)("[O]ur concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances.").  The United States Supreme Court has explained that the substantive component of the Due Process clause, at its core, is a "protection against arbitrary action."  *Lewis.* 523 U.S. at 845.  Conduct is considered arbitrary when it may reasonably be said to "shock the conscience."  *Id.* at 847.  The Court described a spectrum of culpability whose ends point either away from liability or towards it.  *Id.* at 848.  At one end of the culpability spectrum is negligence.  Because the Constitution does not guarantee due care on the part of state officers, liability for negligently inflicted harm "is categorically beneath the threshold of constitutional due process."  *Id.* at 849 (citing *Daniels v.*

---

[8]

Pennsylvania law broadly defines hazing, in pertinent part, as:

> [a]ny action or situation which recklessly or intentionally endangers the mental health or physical safety of a student. . .The term shall include, but is not limited to, any brutality of a physical nature, such as whipping, beating, branding, forced calisthenics, exposure to the elements. . .or any other forced physical activity which adversely affects physical health and safety of the individual, and shall include any activity which would subject the individual to extreme mental stress. . .which could adversely affect the mental health or dignity of the individual.

24 P.S. § 5352.

*Williams*, 424 U.S. 327, 331 (1986)). Behavior on the other end of the culpability spectrum would most likely support a substantive due process violation. *Id.* "Conduct intended to injure in some way unjustifiable by any government interest is the sort of official action that would most likely rise to the conscience-shocking level." *Id.*; *see also Daniels*, 474 U.S. at 331 ("Historically, the guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property" (emphasis in original)).

Following the Supreme Court's lead in *Lewis*, the United States Court of Appeals for the Third Circuit has defined the issue of whether conduct rises to the level of a constitutional violation as "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Kaucher v. County of Bucks*, 455 F.3d 418, 425 (3d Cir. 2006)(citations omitted). The Court of Appeals acknowledged that the question of whether conduct is conscience-shocking has an "elusive" quality to it. *Estate of Smith v. Marasco (Smith I)*, 318 F.3d 497, 509 (3d Cir. 2003). What shocks the conscience in one environment may not appear so egregious in another. *Kaucher*, 455 F.3d at 425-26 (citing *Lewis*, 523 U.S. at 850). The "exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case." *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999). Actions unjustifiable by any government interest are "most likely to rise to the conscience-shocking level." *Kaucher*, 455 F.3d at 426

The conditions under which a defendant acted also must be considered. *Id.* When a defendant is confronted with a "hyperpressurized" environment, such as a high-speed car chase, deliberate intention to harm the victim is usually necessary for the conduct to be conscience-shocking. *Estate of Smith v. Marasco (Smith II)*, 430 F.3d 140, 153 (3d Cir. 2005). When the

defendant has the ability to reflect and deliberate prior to making a decision, deliberate indifference may be enough to shock the conscience. *Miller*, 174 F.3d at 375-76.

The Due Process Clause generally does not extend to a public employer's ordinary breach of its duty of care relative to its employees. *Collins v. City of Harker Heights*, 503 U.S.115, 128 (1992); *Fagan v. City of Vineland*, 22 F.3d 1296, 1304 (3d Cir. 1994). However, the Court of Appeals for the Third Circuit has also recognized situations in which the conduct of state employees against other state employees can serve as the basis for a substantive due process violation. *See Kaucher*, 455 F.3d at 430-31. First, in *Eddy v. Virgin Islands Water & Power Auth.*, 256 F.3d 204 (3d Cir. 2001), the Court of Appeals rejected the defendant's argument that the shock-the-conscience test is inapplicable in cases involving the public employment setting. In *Eddy*, the plaintiff was electrocuted after being ordered to fix a high-voltage electrical wire, without being given proper training, equipment or protective clothing. *Eddy*, 256 F.3d at 212. The plaintiff was threatened with discharge if he refused. *Id.* at 213. A public employee can bring a substantive due process claim against another public employee provided the alleged conduct rises to the conscience-shocking level. *Id.* at 213. Second, in *Kaucher*, the court cited with approval the Eighth Circuit decision *Hawkins v. Holloway*, 315 F.3d 777 (8th Cir. 2003). There, a sheriff pointed loaded weapons at employees. *Id.* at 787. While the Court of Appeals for the Eighth Circuit acknowledged that there is no constitutional guarantee for a safe workplace, it held that the sheriff "deliberately abused his power by threatening deadly force as a means of oppressing those employed in his department, thus elevating his conduct to the arbitrary and conscience-shocking behavior prohibited by substantive due process." *Id.*

The Court of Appeals for the Seventh Circuit also examined the contours of a constitutional tort in § 1983 actions in the public employment setting. In *Wudtke v. Davel*, 128

16

F.3d 1057 (7th Cir. 1997), the plaintiff teacher complained that the school district's superintendent abused his authority to extort sexual favors from her. *Wudtke*, 128 F.3d at 1059. The court held that the teacher's allegations stated a § 1983 action because the superintendent's authority over the teacher enabled him to assault her. *Id.* at 1063. Similarly, the Court of Appeals for the Tenth Circuit concluded that an assault, standing alone, does not constitute a substantive due process violation, but "the combination of serious physical abuse and the assaulting official's authority to force the victim to submit *can* shock the conscience." *Williams v. Berney*, 519 F.3d 1216, 1223 (10th Cir. 2008)(emphasis added).

Defendants cite to several cases from other circuits that hold that hazing among state officers does not rise beyond the level of a state tort violation to a federal constitutional violation. *See Skinner v. City of Miami*, 62 F.3d 344, 348 (11th Cir. 1995); *Fournier v. Reardon*, 160 F.3d 754 (1st Cir. 1998).[9] However, there are key distinctions between these cases and the present action. First, neither case involved state officers relying on their authority to force the plaintiff to submit to the particular assault. *Skinner*, 62 F.3d at 348; *Fournier*, 160 F.3d at 758. Second, in *Fournier*, while the plaintiff received a serious injury, the defendants did not intend to cause that injury, and that lack of intent put the case on the end of the culpability spectrum pointing to no liability. *Fournier*, 160 F.3d at 758. Finally, in *Skinner*, the court noted that the plaintiff could point to no authority supporting the proposition that the sort of sexual assault the defendants committed constituted a substantive due process violation. *Skinner*, 62 F.3d at 348.

---

[9]     In *Skinner*, fellow firefighters hazed the plaintiff by knocking him to the floor, handcuffing his wrists, and having a naked defendant straddle him and rub his genitals across his face. *Skinner*, 62 F.3d at 346. The *Fournier* case involved police officers handcuffing a student officer, jamming papers in his mouth, and forcing him to walk back to class. *Fournier*, 160 F.3d at 756. The student officer fainted and gagged, allegedly sustaining serious injuries. *Id.*

This case, however, was decided prior to the Supreme Court's decision in *United States v. Lanier*, 520 U.S. 259 (1997), in which the Court concluded that sexual assault by a state actor could be the basis for a substantive due process violation.  Because the *Skinner* case is arguably contrary to *Lanier*, the Court finds the *Skinner* decision unpersuasive.

Turning to the present case, Plaintiff alleges that Johnston, exercising his authority as an officer required to train CO's, ordered Plaintiff to go into the "bubble" area of his particular cell block and remove his PAT and keys.  (Docket No. 21 at ¶ 24).  The other Training Defendants were either already in the room or entered with Plaintiff.  (*Id.*).  The Training Defendants then ordered Plaintiff to handcuff himself.  (*Id.* at ¶ 27).  After refusing this order several times, Stoner and Johnston forcibly handcuffed Plaintiff's hands behind his back, hit Plaintiff on his right side, then ordered him to the ground.  (*Id.* at ¶ 28).  The Training Defendants forced Plaintiff to the ground and tied his feet behind his back, thereby hog-tying him.  (*Id.* at ¶¶ 29-31).  Hog-tying an individual may lead to death.  (*Id.* at ¶ 30).   Plaintiff claims that he still suffers from numbness in his right arm and shoulder, limited use and limited range of motion of his right arm, pain in his right arm and shoulder and other physical injuries as a result of this incident.  (*Id.* at ¶¶ 53-55).  Additionally, Plaintiff has flashbacks and difficulty sleeping and has been diagnosed with post-traumatic stress disorder and other psychological conditions as a result of this incident.  (*Id.*).  As training officers, the Training Defendants had authority over Plaintiff, a CO trainee, and Plaintiff claims they exercised that authority to oppress him and injure him. Plaintiff's allegations, therefore, may fairly be construed to state a claim that the Training Defendants' hog-tying of Plaintiff was conducted with an intent or purpose to cause harm, did in fact cause Plaintiff injuries and was unrelated to any conceivable state interest.  Accordingly, the Training Defendants' conduct rises above the level of a mere state tort violation to the

18

conscience-shocking level.  Plaintiff has, therefore, sufficiently alleged a substantive due process violation under the Fourteenth Amendment as to the Training Defendants.  The Court now turns to Plaintiff's claims against the Supervisory Defendants.

### C.    Plaintiff's Claims as to the Supervisory Defendants

Defendants argue that even if Plaintiff alleges a constitutional violation against the Training Defendants, the Supervisory Defendants did not cause Plaintiff to be subjected to said constitutional violation.  (Docket No. 36 at 11-14).  Plaintiff argues in response that because the Supervisory Defendants knew of, authorized, and actively encouraged a custom or policy of violence against CO's by other CO's, they caused Plaintiff to be subjected to the constitutional violation committed by the Training Defendants.  (Docket No. 53 at 9-16).

In *Monell v. New York City Dept. Of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that the language of § 1983 "plainly imposes liability on a government that, under color of some official policy, 'causes' an  employee to violate another's constitutional rights."  *Id.* at 691-92.  It is well established that no liability exists under section 1983 solely by means of vicarious liability, or *respondeat superior*.  *Shaw v. Stackhouse*, 920 F.2d 1135, 1147 (3d Cir. 1990).  Instead, in order for section 1983 liability to attach, a plaintiff must show that a defendant was personally involved in the deprivation of his or her federal rights.  *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005).  In cases involving a supervisory or reviewing defendant, personal involvement may be shown through "allegations of personal direction or of actual knowledge and acquiescence."  *Id.* at 353 (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).

A state official in a supervisory role has no affirmative constitutional duty to supervise or discipline subordinates so as to prevent the violation of constitutional rights.  *Brown v.*

*Grabowski*, 922 F.2d 1097, 1120 (3d Cir. 1990).  However, in cases where a supervisory official knowingly permits a continuing custom or policy that results in harm to a plaintiff, § 1983 liability may attach.  *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 673 (3d Cir. 1988), *overruled in part on other grounds by Leatherman*, 507 U.S. at 168.  At a minimum, such liability attaches "only where there are both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate." *Colburn*, 838 F.2d at 673 (quoting *Chinchello v. Fenton*, 805 F.2d 126, 133 (3d Cir. 1986)); *see also Warren v. Vincent*, Civ. A. No. 08-250J, 2010 WL 10400, at * 5 (W.D.Pa. Jan. 4, 2010).

In addition to describing a policy, Plaintiff makes numerous references to a "custom" of violence by CO's against other CO's at SCI-Fayette.  (Docket No. 21 at ¶¶ 4, 5, 21, 52, 66, 67, 68, 74, 75, 76, 77).  A "custom" is "an act 'that has not been formally approved by an appropriate decisionmaker,' but that is 'so widespread as to have the force of law.'" *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003)(quoting *Bd. of the County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997)).  Conduct that occurs after a constitutional violation takes place may be probative of a custom or policy.  *Beck v. City of Pittsburgh*, 89 F3d 966, 972 (3d Cir. 1996).

In the instant action, Plaintiff alleges that fellow CO's Rogers and Childs told him that they, too, were subjected to hazing as trainees.  (Docket No. 21 at ¶¶ 27, 35).  Additionally, the Supervisory Defendants knew that Wentroble had previous disciplinary issues.  (*Id.* at ¶¶ 4, 38, 65).  The Supervisory Defendants also knew, saw, and acquiesced to the custom of violence against CO's by CO's at SCI-Fayette.  (*Id.* at ¶ 21).  Plaintiff reported the incident to Lynch on

three occasions; and, each time, Lynch took no action.  (*Id.* at ¶ 37).  Further, Sutton threatened

Plaintiff's career if he reported the incident, and Hockenberry threatened "street time."  (*Id.* at ¶¶

39, 41).  Palanchar and Lynch did not object to these efforts to dissuade Plaintiff from reporting

the incident.  (*Id.* at ¶ 33).  Based on these facts, Plaintiff claims the actions of the Supervisory

Defendants encouraged the custom of violence against CO's by CO's.  (*Id.* at ¶ 48).  Hockenberry

and Sutton's comments show that they knew of the prior incidents of violence by the CO's

involved in the present hazing incident, and that they took no action to prevent it.  (*Id.* at ¶ 63).

To this end, all Supervisory Defendants had actual knowledge of prior acts of violence against

CO's by CO's.  (*Id.* at ¶¶ 68, 75).[10]

Defendants assert that any action taken by the Supervisory Defendants *after* the hazing

incident could not have communicated to the Training Defendants *prior* to said incident that

such conduct was acceptable.  (Docket No. 36 at 12).  However, Plaintiff alleges that the

Training Defendants knew of prior incidents of violence, encouraged such action, and took no

action to stop it.  Plaintiff has sufficiently stated a claim against the Supervisory Defendants, as

they had knowledge of a pattern of at least two other similar hazing incidents and took no action

to prevent them, which may be construed to communicate to the Training Defendants that hog-

tying the Plaintiff would be acceptable.  Accordingly, Plaintiff's averments that the Supervisory

Defendants committed a violation of his substantive due process rights under the Fourteenth

Amendment are sufficient at this stage.

---

[10]

The Supervisory Defendants contend that Plaintiff simply "made up" the allegations that they knew of Wentroble's prior disciplinary problems, that they threatened Plaintiff with his job and discipline, and that they had actual knowledge of prior acts of violence of CO's on CO's because they did not appear in the first Complaint.  (Docket No. 36 at 13).  However, at this stage the Court must accept all Plaintiff's factual allegations as true.  *Hemi Group, LLC*, 130 S.Ct. at 986-87.

21

D.      Plaintiff's Claims as to the "Jane or John Doe" Defendants

Defendants have not raised the issue of Plaintiff's naming of "Jane or John Doe" defendants.  However, the Court notes that the "[u]se of John Doe Defendants is permissible in certain situations until reasonable discovery permits the true defendants to be identified." *Blakeslee v. Clinton County*, 346 Fed.Appx. 248, 251 (3d Cir. July 14, 2009)(citing *Klingler v. Yamaha Motor Corp., U.S.A.*, 738 F.Supp. 898, 910 (E.D.Pa. 1990)); *see also, e.g., Abels v. State Farm Fire & Cas. Co.*, 770 F.2d 26, 31-32 (3d Cir. 1985).  As there has been no discovery in this case to this point, the Court permits the "John or Jane Doe" Defendants to remain as parties until discovery reveals whether there are other defendants to be named.

V.      **Conclusion**

Based on the foregoing, Defendants' Motions to Dismiss (Docket Nos. [28], [35], [39], [42]) are DENIED.  An appropriate order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

cc/ecf:  All counsel of record
Date:    March 29, 2010

22