EXHIBIT
tabbles
4

E. Johnston - by Ms. Wolvovitz

Q. What was your understanding when you heard that, that statement? First, he's pretty cool, what was your understanding of what that meant?

**A. Exactly what I stated. I mean, that's their opinion. I don't know him. I make my own opinion of people. Like I said, I respect Wentroble and Stoner's opinion.**

Q. What was your understanding of the statement, likes to bust balls?

**A. It means he's got a grind game.**

Q. I'm sorry?

**A. A grind game.**

Q. What is a grind game?

**A. You better have one in prison. The inmates are talking crap on you; you talk crap back to them. It's a grind game. It's an everyday thing.**

Q. Is a grind game between officers -- corrections officers or among inmates --

**A. Amongst everybody. It's just -- you have to understand, we're like a city inside 68 acres. That's kind of the unwritten rules of the city. The inmates talk shit; you talk shit**

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152

30
E. Johnston - by Ms. Wolvovitz

**back. It's an everyday thing.**

Q. So officers joke around, talk shit with each other --

**A. Correct.**

Q. Is that what you're saying?

**A. Yes.**

Q. Do they play around or do other things to each other?

**A. What are you saying? I'm not really sure --**

Q. Well, you referred to tying two guys to doors; tying people to bedsheets --

**A. Yes. That's been happening since I started in '93. It happens all the time.**

Q. When you say, "all the time," do you mean --

**A. Not like every day, but, I mean, it's pretty frequent.**

Q. Would you say once a week you would hear something?

**A. I would say, yes. I might not see it, but, I mean, rumor.**

Q. Who are the two twin brothers that you referred to?

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152

31
E. Johnston - by Ms. Wolvovitz

**A. I'm trying to remember their names. Somebody else could clarify it for you. They would know exactly who I'm talking about. I see them all the time, too. I can't remember their last name. That's pretty much how we know everybody at the prison, is by last name.**

Q. Do you remember what rank they have?

**A. They're both COs.**

Q. Are they still COs or were they COs then?

**A. They're still COs and were COs then.**

Q. So you said they said something to you about a bar?

**A. Yes.**

Q. Stoner or Wentroble mentioned that they had been at a bar with these two twin brothers?

**A. Right.**

Q. Anybody else?

**A. There was other people there, but I don't specifically remember the names.**

Q. Did they say -- was Chisler there with them or someone else?

**A. I don't know who rode with who. I**

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152

32
E. Johnston - by Ms. Wolvovitz

**wasn't there.**

Q. Did they tell you what happened at the bar?

**A. I guess they were just busting each other's balls. Chisler was talking a lot of crap on Marines. It was back and forth. One of the twin brothers and Chisler was wrestling around and stuff, but it was all joking and stuff.**

Q. Do you recall what they said about -- that Chisler said about Marines?

**A. No, I don't.**

Q. Was he hostile to Marines, to your memory?

**A. Other than that day, I've never met Chisler in my life. I don't --**

Q. Well, what they said to you -- I'm sorry, finish your answer.

**A. I don't know what his intentions were towards Marines. From the picture that I was painted, it sounded like they were all joking and he had a good grind game.**

MR. LOUGHREN: Are you saying G-R-O-U-N-D or G-R-I-N-E? What are you saying?

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152

45
E. Johnston - by Ms. Wolvovitz

A. **Well, yes. I heard about a cadette cuffing himself and having to see a white shirt. But, like I said, again, I did not know it was Chisler.**

Q. How did you hear about that?

A. **Rumor.**

Q. When did you learn it was Chisler?

A. **When Lt. Wentroble stated it on the 7th.**

Q. Did he say anything about the circumstances or how Chisler was cuffed?

A. **The rumor was he was -- he had another cadette that started with him and he was basically telling the other cadette, this is how you cuff an inmate, or something. That is the rumor. I don't know the actual facts. I wasn't there. I really can't answer that for you.**

Q. Have you ever worked in the bubble at Fayette?

A. **Yes.**

Q. Do officers ever bring in a TV on Sundays to watch the game to the bubble?

A. **I personally never have, but, yes, I**

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152

46
E. Johnston - by Ms. Wolvovitz

**would believe they probably have on occasion.**

Q. Have you heard that officers have done that?

A. **I've heard it, yes.**

Q. Do officers bring extension cords in with them in order to either hook up a coffee pot or TV or whatever --

MR. GRIMM: Objection to the form of the question.

Q. -- or any other electronic device?

A. **I would have no idea.**

Q. Have you ever been in a bubble and seen an extension cord there?

A. **Yes, yes.**

Q. Is that a fairly standard piece of equipment in a bubble?

A. **Ma'am, you did a round at my prison. I'm sure you've been in many of the bubbles. Almost every one of them will have an extension cord. Almost every one of them will have a plug in with four or five outlets. There's several pieces of equipment, i.e. coffee pot being one of them, that need plugged in; battery chargers, you name it. Every bubble**

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152

47
E. Johnston - by Ms. Wolvovitz

**you go to is going to have those.**

Q. Is it important among COs for you to be able to trust your fellow COs at the prison?

A. **I would think so, yes.**

Q. Have you ever heard the phrase, snitches get stiches?

A. **Yes, I've heard that phrase.**

Q. What does it mean to you?

A. **That's something -- we could have five different opinions in this room --**

Q. I'm asking what it means to you.

A. **Obviously, it's a warning not to be a snitch. That's the only thing I can figure.**

Q. Have you heard it in reference to inmates?

A. **Yes. I've heard it on the streets. It's not an uncommon saying.**

Q. Have you heard it in reference to corrections officers?

A. **I can't recall.**

Q. The trust that you described between COs, is that, in your view, important in terms of the functioning of the prison?

A. **Are you concepting where we work at?**

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152

48
E. Johnston - by Ms. Wolvovitz

**About 90 percent of our inmates are doing life, 40 to 80 years. My job is to get them to do things on a daily basis. If they don't want to do it, conflict can happen at any time. I'm one person. These guys lift weights all day long. They're in shape. I'm one person. Yes, I would hope that my fellow brother would help me out.**

Q. You've talked about various things that officers do fooling around with each other, tying bedsheets and a couple of other things.

Would you characterize those as horseplay?

A. **Definitely.**

Q. In your experience in the prison system in Pennsylvania, have you come across horseplay on a fairly regular basis at the prison?

A. **Yes.**

Q. Would you consider COs wrestling with each other, would that be horseplay?

A. **Yes.**

Q. And COs cuffing each other, would

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152

49

E. Johnston - by Ms. Wolvovitz

that be horseplay?

A. **Correct.**

Q. Do COTs, cadettes who are in training, do they typically as sort of an initiation into being a corrections officer have more instances of horseplay against them, receive more horseplay than, say, a long-term corrections officers?

MR. LOUGHREN: Object to the form of the question.

Q. You can answer.

A. **I would have no idea of that. I don't keep statistics. I don't do a pie chart. My whole thing is, I've seen it from -- I've seen captains, lieutenants -- I mean, throughout my whole career, everybody participates in horseplay. It happens all the time.**

Q. Can you recall any particular captains or lieutenants that you can recall participating in horseplay?

A. **That would be snitching. Those are incidents that have nothing to do with this case.**

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152

50

E. Johnston - by Ms. Wolvovitz

Q. Well, sir, you are under oath to tell the truth. This is an appropriate question to ask you in this deposition.

THE WITNESS: If I answer this, would it put other officers in -- would they be subject to disciplinary action?

MR. GRIMM: I don't believe so, but you are obligated to answer the question.

A. **Well, Lt. Mazingo, just to name one of them, he no longer works -- he's down at Pittsburgh. These are just instances off the top of my head --**

Q. Yes.

A. **Lt. Powley --**

Q. How do you spell that --

A. **P-O-W-L-E-Y. Lt. Ansel --**

Q. A-N-S-E-L?

A. **Yes. Ma'am, you're asking me to remember so many --**

Q. Can you think of any captains? You have given me a number of lieutenants' names.

A. **Obviously, Manchas, but he wasn't a captain at the time.**

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152

51

E. Johnston - by Ms. Wolvovitz

Q. The names you've given me, Mazingo, Powley and Ansel, the instances that you're thinking of, were they lieutenants at the time?

A. **Yes.**

Q. Can you recall any of the specifics of any of the instances of horseplay with respect to Mazingo, Lt. Mazingo?

A. **Yes. It was standard. They got me down and taped me to a chair. Just horseplay, things they do.**

Q. What about Lt. Powley?

A. **Up on the range, getting guys down, handcuffing them.**

Q. Did you see that?

A. **Yes, I saw.**

Q. I'm sorry, this occurred on the range?

A. **Yes. You're talking -- I couldn't even tell you what years, the '90s.**

Q. What is the range?

A. **Where we shoot our weapons at.**

Q. Do you recall how many guys were cuffed and brought down?

A. **Well, he was cuffed himself at that**

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152

52

E. Johnston - by Ms. Wolvovitz

**-- it was just things we do.**

Q. Did he cuff other guys as well, or just himself?

A. **I don't remember what he did, ma'am. I just know he was a participant.**

Q. And Lt. Ansel, what was --

A. **The same thing.**

Q. The cuffing or --

A. **The wrestling, goofing around.**

Q. Do you recall Ansel handcuffed himself or cuffing himself?

A. **I'm sure. I can't give you specifics. You're talking '90s.**

Q. Do you have anything from the 2000s?

A. **You got Lt. Reposky. I mean, there's just so many.**

Q. Lieutenant who?

A. **Reposky, Tift. I could go on and on and --**

Q. Please.

A. **I can't remember everything.**

Q. Well, why don't you tell me the names of the people you remember.

A. **I just did.**

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152

53

E. Johnston - by Ms. Wolvovitz

Q. You said you could go on and on. You said Reposky and Tift. Anybody else --

**A. There's so many. You're asking me for specifics --**

Q. Well, I'm asking for the names --

**A. If I give you specifics, I could be wrong. This could happen with this one; this could happen with that one. Do you understand what I'm saying? You're asking me to be specific --**

Q. I'm asking you for the names of people you recall --

**A. I just gave you two more.**

Q. Do you have any additional names?

**A. Not that I can recall at this time.**

Q. How do you spell Reposky --

**A. R-E-P-O-S-K-Y. I'm guessing.**

Q. Would you consider hog-tieing horseplay?

**A. I would say, yes, but I've never witnessed hog-tieing.**

Q. Have you ever received training with respect to restraints?

**A. Every officer receives, I guess,**

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152

54

E. Johnston - by Ms. Wolvovitz

**self-defense and restraint training.**

Q. What restraints are you trained to use during those trainings?

**A. You got transport restraints, including the cuffs, black box and the chain; leg shackles. That's pretty much it for our restraints.**

Q. Are you ever trained with respect to a four-point restraint?

**A. What do you mean?**

Q. Hog-tieing or hobbling an inmate.

**A. We have a transport thing for -- it's a strap that can go around, but I don't believe they add that to the training. They could though. I don't really remember.**

Q. When you say a strap that goes around, where does it go around?

**A. From the shackles to the handcuffs.**

Q. Just so I understand, you're talking about foot shackles. Would the inmate be handcuffed in the front or the back?

**A. The inmate was handcuffed in the back.**

Q. In the back. Then there would be a

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152

55

E. Johnston - by Ms. Wolvovitz

chain from his legs -- from his feet up to the handcuffs behind him. Is that what you're talking about?

**A. I don't know if they still have it. I remember seeing something. I don't believe it's trained or showed in like everyday training. I think it would be more of a transport training or something like that.**

Q. Is transport training part of the standard training?

**A. No. You have to be on the transport team for that.**

Q. Were you ever on the transport team?

**A. Nope.**

Q. Have you been trained with respect to the reporting of incidents?

**A. Everybody is required to report incidents.**

Q. When you say that "everybody is required to report incidents," what is the requirement? That it be reported in a particular time, or what incidents --

**A. Everything has its own time frame. It's supposed to be done within the same shift.**

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152

56

E. Johnston - by Ms. Wolvovitz

Q. Are there particular things that should be reported as an incident?

**A. Obviously, inmate assaults, things like that.**

Q. Have you ever heard of an instance where someone was disciplined or an investigation was undertaken when there was an instance of horseplay as you have described it?

**A. Not to my knowledge.**

Q. Have you ever received any training with respect to workplace violence?

**A. They gave me a directive, like a thing about it when they started the investigation.**

Q. I will show you a document we will mark as Exhibit 1.

(Johnston Exhibit No. 1 was marked for identification.)

Q. Is this the document that you were provided with the investigation?

**A. I'm really not sure. This has management directive, which I'm not management. I really don't recall the exact document that they showed me, but I don't think it had this**

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152

145

E. Johnston - by Mr. Grimm

A. **No, nobody kicked him.**

Q. Was the Plaintiff ever forced to the ground on that date and time?

A. **No.**

Q. Additionally, Paragraph 29 says that the Plaintiff's legs were pulled out from under him and his feet were forced up to hands behind his back.

Is that a true statement?

A. **It is not true.**

Q. Furthermore, in that paragraph it states that the Plaintiff stopped resisting because it became too difficult for him to breathe. Plaintiff felt as though he was suffocating and could barely talk.

At any point in time during this alleged incident, do you observe the Plaintiff having a difficult time talking?

A. **No.**

Q. Additionally, it says that an electrical cord was used to tie Plaintiff's hands to feet behind his back to hog-tie him.

Is that a true statement?

A. **He was never hog-tied, no.**

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152

146

E. Johnston - by Ms. Wolvovitz

Q. Have you ever observed anyone at SCI Fayette or any other state correctional institute being hog-tied?

A. **No.**

Q. Paragraph 31, Plaintiff was physically immobilized in this position and held down by Defendants Johnston, Wentroble and Stoner.

Is that a true statement --

A. **No, that's not true.**

MR. GRIMM: Nothing further of this witness.

-----

EXAMINATION

BY MS. WOLVOVITZ:

Q. Attorney Grimm asked you about whether or not there was a custom of hazing or policy of hazing at SCI Fayette. I believe you testified, and if I'm wrong, please tell me that, no, but there was of horseplay; is that correct?

A. **That's correct.**

Q. So it's your testimony that there was a custom of horseplay at SCI Fayette; is

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152

147

E. Johnston - by Ms. Wolvovitz

that correct?

A. **I would say, yes; but not just at Fayette, the Department of Corrections in general.**

Q. So you're saying, for instance, at Waynesburg you would say there's a custom of horseplay at Waynesburg as well?

A. **Yes.**

Q. Did you hear of horseplay at other prisons in the SCI system?

A. **Yes. I've heard stories. Like I said, I have no validity to them. I've heard stories. There's guys that work at my prison from Graterford. I've heard them talking about things they used to do; guys from Pittsburgh; guys from Green.**

Q. Let me ask you, did anybody feel that they couldn't talk about those things when they talked about them; any of the people that you heard talking about it?

MR. GRIMM: Objection to the form of the question.

A. **I can't give you an answer of what they were thinking, ma'am. I can only tell you**

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152

148

E. Johnston - by Ms. Wolvovitz

**what they said, not what they were thinking or feeling.**

Q. When these officers told you about instances of horseplay, did they ever say something to the effect of, don't tell anybody?

MR. MARMO: I'm going to object to the form of the questions in this line of questioning in that it seems that present counsel is trying to interchange horseplay for hazing, which the witness has clearly testified are not the same.

MS. WOLVOVITZ: I'm asking about horseplay. It's very clear.

Q. You can answer.

A. **Can you repeat the question.**

Q. When you've heard officers talk about instances of horseplay, has anyone ever said to you, don't tell anyone about this, or words to that effect?

A. **Not to my recollection.**

Q. Thank you.

I'm going to show you a document that is defined, Training for Training Sergeants. I'm not going to make this an

AMENT & AMENT
Court Reporting, LLC - Phone 412-793-6152