Page 206

```
 1         C. Chisler - by Mr. Grimm
 2    Q.   During the course of your
 3  employment, did you witness any other acts
 4  against any other COTs as you have alleged
 5  happened in the bubble on October 7, 2007?
 6    A.   Physically witness, no.
 7    Q.   Going back to the Complaint at
 8  Exhibit No. 1, paragraph 21 -- back up just a
 9  moment. The federal system is a little bit
10  different than I do in the county, but at some
11  point in time did you read this Complaint
12  before it was filed?
13    A.   Yes.
14    Q.   At paragraph 21 you're making a
15  statement, and you'll agree with me that this
16  Complaint are statements that you're making,
17  the allegations that you're making? This is
18  you making these allegations; right?
19         MS. WOLVOVITZ: Objection.
20  This was written by counsel. He did not write
21  these allegations nor did he phrase them with
22  respect to a legal concept and legal theories.
23    Q.   So you're not alleging that
24  paragraph 21 is true and correct?
25    A.   I'll agree with alleging it. Yes, I
```

Page 207

```
 1         C. Chisler - by Mr. Grimm
 2  do allege it.
 3    Q.   Would you agree with me that your
 4  counsel prepared this Complaint based on facts
 5  that you provided to her?
 6    A.   Yes.
 7    Q.   Now, I'm looking specifically at
 8  paragraph 21 where you state that "There was a
 9  well-known custom, pattern and practice of
10  violence against corrections officers by
11  corrections officers (COs) at SCI Fayette. The
12  violence by COs included handcuffing, punching,
13  choking, kicking and other conduct of this
14  nature. All Defendants not only knew of this
15  custom and practice; saw it, acquiesced in it
16  by their actions and ratified it by condoning
17  and encouraging such misconduct." Do you agree
18  with that?
19    A.   Yes.
20    Q.   Did you tell your legal counsel
21  that?
22         MS. WOLVOVITZ: Objection.
23  That's attorney-client privilege. Do not
24  answer that question.
25         MR. GRIMM: Barbara, you
```

Page 208

```
 1         C. Chisler - by Mr. Grimm
 2  brought it up by saying that you prepared this
 3  and you prepared it on his direction; so I
 4  think you waived the attorney-client privilege
 5  by that statement because I asked him if this
 6  was his statement, and you said no, it's mine.
 7         MS. WOLVOVITZ: Well, I
 8  drafted it. He looked at it.
 9         MR. GRIMM: You drafted it,
10  and he looked at it so there -- what privilege
11  is in that, you just waived it. I'll move on
12  because I don't want to take up anyone's time.
13  BY MR. GRIMM:
14    Q.   My question to you is what is the
15  basis of that statement?
16    A.   Before this happened to me, there
17  were officers told me and a couple of the other
18  officers that an officer by the last name of --
19  I don't know if it's Wayne or Waim was duct
20  taped to a chair in the hole, pushed down the
21  stairs and handcuffed by other personnel in the
22  jail.
23    Q.   You didn't see that happen?
24    A.   Didn't see it.
25    Q.   Who told you that?
```

Page 209

```
 1         C. Chisler - by Mr. Grimm
 2    A.   I can't remember. The only person I
 3  remember in the group was another trainee. His
 4  last name was Colgan because I remember he was
 5  laughing and giggling and saying that happened.
 6    Q.   Did trainee Colgan tell you this
 7  story?
 8    A.   No. He didn't say he was there.
 9    Q.   But he heard it, and he was
10  laughing?
11    A.   Yes.
12    Q.   But he didn't state that he was
13  there to see it?
14    A.   Yes.
15    Q.   Do you know anybody who witnessed
16  that incident?
17    A.   No.
18    Q.   What other incidents form the basis
19  of this statement?
20    A.   The day after this happened to me, I
21  was approached by another trainee.
22    Q.   What was that trainee's name?
23    A.   Terry Childs.
24    Q.   What did Mr. Childs tell you?
25    A.   He said that they came in,
```

Page 262

```
 1        C. Chisler - by Mr. Willig
 2   A.   Yes.
 3   Q.   So Lynch and Palanchar had
 4   absolutely no supervisory authority over
 5   Wentroble; correct?
 6   A.   I would assume so, yes.
 7   Q.   Lieutenant is higher than sergeant?
 8   A.   Yes.
 9   Q.   Sutton and Hockenberry, they're
10   lieutenants; correct?
11   A.   Yes.
12   Q.   Same rank as Wentroble?
13   A.   Yes.
14   Q.   They don't have any supervisory
15   responsibility over him, do they?
16   A.   Not that I assume, no.
17   Q.   Stoner and Keller, I believe -- or
18   no, no. Stoner and Johnston, are they both
19   sergeants?
20   A.   Yes.
21   Q.   Lynch and Palanchar are sergeants?
22   A.   Yes.
23   Q.   So Lynch and Palanchar have no
24   supervisory responsibilities over Stoner and
25   Johnston; correct?
```

Page 263

```
 1        C. Chisler - by Mr. Willig
 2   A.   Correct.
 3   Q.   Because they are all sergeants?
 4   A.   Yes.
 5   Q.   Now, Mr. Grimm asked you about this,
 6   and I want to explore this more because this is
 7   important to my client. Paragraph 21 of the
 8   Complaint, there is a well-known custom, policy
 9   practice, et cetera, et cetera, et cetera. I
10   don't want to put words in your mouth, but this
11   is very important. You base that
12   representation, you base that allegation on
13   three incidents, and we'll talk about them.
14   The duct taping incident, Childs and Rodgers?
15   A.   And myself, four incidents.
16   Q.   So there are four incidents that in
17   your mind establish a well-known custom,
18   policy, practice of violence against COs by COs
19   including handcuffing, punching, choking,
20   kicking and other conduct of this nature; is
21   that correct?
22   A.   Yes, sir.
23   Q.   Do you know the time frame those
24   four incidents, do you know the time frame that
25   it spans from which one was the first? Do you
```

Page 264

```
 1        C. Chisler - by Mr. Willig
 2   know which one in time was the first?
 3   A.   I'm going to assume it was Wayne.
 4   Q.   Is that the duct taping?
 5   A.   The duct taping, yes.
 6   Q.   You're going to assume it. You
 7   don't know that?
 8   A.   I don't know, no. I don't know how
 9   long he was at the facility or when he started
10   or what, but he was there longer than us
11   because we were trainees, and I think he had
12   turned over.
13   Q.   He had turned over to a CO?
14   A.   Yes.
15   Q.   And you are a COT for a year?
16   A.   Yes.
17   Q.   Is that correct?
18   A.   Yes.
19   Q.   Do you have any idea on when this
20   duct tape incident occurred --
21   A.   No.
22   Q.   -- as opposed to your incident?
23   Before it?
24   A.   Before it, yes.
25   Q.   But you don't know how much before
```

Page 265

```
 1        C. Chisler - by Mr. Willig
 2   it?
 3   A.   No, sir.
 4   Q.   The only thing you know about that
 5   is what somebody told you about it?
 6   A.   Yes.
 7   Q.   You don't know who told you about
 8   it?
 9   A.   I don't know who it was.
10   Q.   The guy who actually was the victim
11   of this custom, policy, practice, what was his
12   name?
13   A.   Wayne or Waim. I don't know. I
14   don't remember the tag on his -- I don't
15   remember what it was.
16   Q.   He never told you about it?
17   A.   He was there. He was acknowledging
18   that it happened. He didn't come out and say
19   they did this, they did this, they did this,
20   but he was there and acknowledging that it
21   happened.
22   Q.   They who?
23   A.   I don't know. They referenced them
24   as they, you know, they duct taped him and
25   pushed him down the stairs while he was
```

Page 266

C. Chisler - by Mr. Willig

1
2  handcuffed.
3      Q.  Was they the same guys that are
4  involved in this case?
5      A.  I couldn't tell you.  I don't know.
6      Q.  You have no idea?
7      A.  No idea.
8      Q.  And no idea when it happened?
9      A.  No idea.
10     Q.  You just think it was before --
11 well, you know it was before you?
12     A.  Yes.
13     Q.  When Wayne the guy who got duct
14 taped, was he a CO at the time he was telling
15 you this?
16     A.  I believe he was a trainee because I
17 can remember some of the conversation that day
18 dealt with being a trainee, you know, like what
19 we had to do and what we were going through.
20     Q.  He was still a trainee at the time
21 that you learned of this, this first incident?
22     A.  I don't know, but he was a trainee
23 at the time that his incident occurred.
24     Q.  Understood, but at the time that
25 he's standing there and this other guy is

Page 267

C. Chisler - by Mr. Willig

1
2  telling you about it, was he a CO, the guy who
3  got hazed for one of a better term?
4      A.  For some reason, I think he just
5  turned over.  I'm not sure.  I'm not certain.
6  I think he was a CO.
7      Q.  So what supposedly happened to him
8  happened at some time during the previous year?
9      A.  It could have been.  If he had only
10 turned over yesterday, it could have been
11 within the previous week.  I mean, it happened
12 at some point in time during his tenure there
13 as a trainee.
14     Q.  Right.  A COT to CO, one year?
15     A.  Yeah, but it doesn't mean his
16 incident happened -- if he started in January,
17 it could have happened in December which would
18 have made it within one year.
19     Q.  Or it could have happened a year
20 ago?
21     A.  It could, yes, it could have.
22     Q.  Or more than a year ago?
23     A.  Yes.
24     Q.  Because he was a CO, he had just
25 turned over.  What is just turned over?  A

Page 268

C. Chisler - by Mr. Willig

1
2  week?  A month?  What?
3      A.  I don't know.  Sometime recently.
4  You're going not going to say a guy that's been
5  turned over three years that just turned over.
6      Q.  But what did you mean by that?
7      A.  Well, the consensus was recently.  I
8  can't tell you a week.  Maybe a month.  I don't
9  know.  My judgment on it, if I had just turned
10 over, it would have been maybe a month or two.
11     Q.  And what happened in that incident?
12 He was duct taped to a chair?
13     A.  He was cuffed and duct taped to a
14 chair and pushed down the stairs, and I
15 remember him saying it was in the hole.
16     Q.  The hole, the RHU?
17     A.  RHU, yes.
18     Q.  But you don't know who did it?
19     A.  Don't know.
20     Q.  Did you ever hear that he was
21 kicked, punched, choked?
22     A.  No.
23     Q.  Or whatever you mean by other
24 conduct of this nature.  Is that what you're
25 meaning when you say duct taped and pushed down

Page 269

C. Chisler - by Mr. Willig

1
2  the stairs?
3      A.  That falls under it, yes.
4      Q.  But none of these other things,
5  punch, choke, kick?
6      A.  No.
7      Q.  How do you know that Sutton or
8  Hockenberry or Lynch or Palanchar knew about
9  that incident?
10     A.  Whenever I told Lynch what had just
11 happened to me, he told me, oh, these guys have
12 to knock this shit off.  I need to talk to
13 them.
14     Q.  Is that in your Complaint?
15     A.  No.
16     Q.  These guys got to knock this shit
17 off?
18     A.  It was in my notebook on a back
19 page.  I didn't transfer it to the typed copy.
20     Q.  And not getting into what you told
21 your attorney or anything like that, but what
22 you told her is the basis of the Complaint;
23 correct?
24     A.  Yes.
25     Q.  And that's nowhere in the Complaint?

68 (Pages 266 to 269)